## STATE v. ALEXANDER VIAUX.

Defendant's counsel having objected to an affidavit made by the deceased for the arrest of the
prisoner, as evidence of a dying declaration—parole proof was offered and admitted, that when
the deceased made his declarations to the magistrate, he considered himself in a dying state—to
which evidence a bill of exceptions was taken. *By the Court :* After the defendant had himself
objected to these declarations, reduced to writing in the form of an affidavit for his arrest—he
could not with any propriety turn round and object to evidence being given by parol of what the
deceased did declare before the magistrate.

When the accused declares himself ready for trial and accepts the jurors, he cannot afterwards object
that the list of jurors, with which he was served, contained the names of persons who were exempt
and of persons who had served on the Grand Jury, by which the indictment was found.

So it is too late, under the same state of facts, to object that the accused was not served with a list
of the names of jurors summoned by special *venire.*

The District Courts have authority, under the Act of 1817, to appoint an attorney to prosecute on
behalf of the State in the absence of the District Attorney.

APPEAL from the District Court, Parish of St. Martin, *Voorhies,* J. *Hardy,*
District Attorney, 15th District, for the State. *Voorhies & Simon,* for
defendant.

### MOTION FOR A NEW TRIAL.

The defendant in the above entitled cause, by his undersigned counsel, begs
leave to move this honorable Court for a new trial, on that part of the verdict
of the jury, by which he has been found guilty of manslaughter, under the
second count of the indictment, for the following reasons, to wit :

1st. Because said defendant has been served with a copy of the whole pan-
nel of the jury, including therein a list of the jurors, who, having served on
the grand jury, by whom the bill of indictment was found against him in this
case, were legally and necessarily exempted from serving as petit jurors on the
trial of this cause, and also including therein the names of certain jurors who
were exempted by law and by the Court from serving on the trial of said
cause.

2d. Because after the regular pannel was exhausted, the Court having ordered two subsequent and new lists of jurors to be made, and the lists so made having been returned by the Sheriff successively during the trial, the defendant was not served with copies of the said new lists or venires, but was immediately called upon to make his challenges, as the jurors were called to the book to be sworn; without his having had any opportunity of consulting or reflecting upon the jurors by whom he was to be tried, or of ascertaining the objections he had to base his challenges upon. All which legal advantages he was deprived of, contrary to law; and all which he did not waive, and could not be waived.

3d. Because the verdict of the jury on the second count of the indictment, is contrary to law and evidence.

Wherefore, the defendant prays that it may please this honorable Court to grant him a new trial on the said second count of the indictment only; the verdict of the jury on the first being definitive. And he prays for all such other and further relief as equity and justice may demand.

*Voorhies*, J. This is a motion for a new trial, founded on the reasons alleged by the defendant.

The first objection urged by him is, that the list of jurors served upon him, under the provisions of the Act of 1809, improperly included the names of the jurors who served on the grand jury by whom the bill of indictment was found, and of jurors who were exempted by law and by the Court. The Act of 1809 provides, that a prisoner "shall have a copy of the indictment and a list of the jury which are to pass on his trial, delivered unto him at least two entire days before he shall be tried." B. & C. p. 248, sec. 39. In support of his position he relies on the case of the *State* v. *Hassell*, 3 An. 90, where it was held, that "a list containing other names than those of the jurors who are really to be presented on the trial, necessarily tended to embarrass the accused in his searches for information, and to confuse him in preparing his challenges, and thus defeated the ends of the law. That such a list was not a compliance with either the letter or the spirit of the statute, though it might at the same time contain the names of all the jurors who were to pass on the prisoner's trial." It was objected on the part of the prosecution, that if such a construction were given to the statute, a prisoner whose trial was assigned for the commencement of a term, before it could possibly be known how many of the pannel would be in attendance, would decline going to trial if the whole number of jurors contained in the list delivered to him were not in attendance. In answer to this objection, the Court remarked—that a just interpretation of the statute did not lead to such a consequence. That the inconvenience to which the prisoner might be subjected in the event of the failure of jurors to attend, from unforeseen causes, was one to which he was necessarily to submit, while deriving the benefits of the Statute. It was one of those unavoidable evils which no legislative foresight could provide against, but could never be serious, the number of jurors selected at each drawing being limited. The object of the law would be fulfilled if the prisoner were furnished with a list which was correct at the time of its delivery." The facts on which that decision was given are stated in the opinion of the Court. After his arraignment, the defendant was served with a list of 108 names, headed "list of jurors drawn to serve during the term of June, 1847," and with a further list of 48 names, headed "List of additional jurors drawn to serve during the term of June, 1847." These lists comprised the names of all those who were originally drawn to serve as jurors for the term, and of two additional drawings ordered by the Judge, in consequence of the large number who, from various causes, were not in attendance on the Court. On the day of trial, a third list was delivered to the prisoner of thirty-six jurors, whom, he was informed, were to be presented to him, and from whom alone the jury was to be selected. These thirty-six jurors were included in the two lists previously served on the prisoner, and of the several drawings were the only jurors present. The counsel objected to going to trial, &c. Under such circumstances, it is obvious that the objection was well taken, otherwise the defendant would have been deprived of the benefits secured to him under the Act of 1809. The provisions of the Act of 1821, under which the drawings of the jurors in that case were made, were only applicable to the first judicial district. The jurors in this case, comprising forty-

STATE
*v.*
VIAUX.

eight names to serve as grand and petit jurors, were drawn under the provisions of the Act of 1846, p. 69, nineteen of whom were set apart to serve as grand jurors. A copy of all their names was served on the defendant two entire days before his trial. The names of all the jurors, written on ballots, including those set apart as grand jurors, were put into the box, and drawn separately, and when called to the book to be sworn, no objection was made by the defendant, on the ground of the illegality of the list thus served upon him.

The regular pannel being exhausted, the Court granted an order of *tales de circumstantibus*, and the number necessary to complete the jury was selected without objection as to the service of the list of the same on the defendant.

There is no doubt but that the defendant was entitled, under the principles laid down in that decision, to a list containing only the names of those of the jurors who were to be presented on the trial. Without deciding on the informality of the list of jurors served on the defendant, arising from the circumstance of including the names of the grand jurors therein—in other words, a copy of the *venire*, it may be inquired whether the objection does not come too late, after having accepted the jurors. In the case of the *State* v. *Hernandez*, 4 An, 379, *King*, J., in delivering the opinion of the Court, said: "When the accused was brought to the bar, he declared himself ready for trial, and accepted the jurors who were to pass upon the charges preferred against him. This is a waiver of the indictment, if indeed one had not been previously served upon him." As to this pre-requisite, the statute is as imperative as it is in relation to the service of the copy of the list of jurors who are to be presented on the trial. In the case of *Howell*, the principle settled was, that the right to claim a copy of the indictment was not forfeited after pleading. But when the accused declares himself ready for trial, and accepts the jurors, does not the objection come too late? I think so. Under the ruling in the case of *Hernandez*, it must be considered a waiver of his right.

2d. The second ground of objection must also be viewed in the same light.

3d. In regard to the third, I am not prepared to say that the verdict of the jury is against law and evidence.

It is, therefore, ordered that the motion for a new trial be overruled.

## MOTION IN ARREST OF JUDGMENT.

The defendant in the above entitled cause, by his undersigned counsel, begs leave to move in arrest of the judgment to be rendered by this honorable Court on the verdict returned by the jury, on the following grounds, to wit:

1st. Because having served with a copy of the original *venire* and of the whole pannel of the jury, in which were included the names of all the jurors who had served upon the grand jury, and also the names of certain jurors who were exempted by law from serving on the jury, said defendant, having prepared his challenges on said list, without being aware of the fact that all said persons, therein named as jurors, were exempted from serving on his trial, has been deprived of the right of exercising his challenges properly, and therefore, has not enjoyed the benefit of a fair and impartial trial as contemplated by law.

2d. Because this honorable Court having ordered two successive *venires* to issue, after the original *venire* had been exhausted, two lists of jurors were returned by the Sheriff instanter and successively. Whereupon the defendant was called on to make his challenges, without being served with any copy of the said lists, as the law directs; by reason of all which he has been embarrassed in making his challenges, and unable to exercise fairly his right of challenging, as contemplated by law.

3d. Because the bill of indictment found by the grand jury in this case, is signed "*Fred. Gates*, District Att'y, pro tem, for the Fourteenth Judicial District of the State of Louisiana;" which office, to wit: that of District Attorney, pro tem, for the Fourteenth Judicial District of the State of Louisiana, is unknown to the constitution and laws of said State, and is not in any manner therein provided for.

4th. Because the person who signed the said bill of indictment, and who submitted to the grand jury, as District Attorney *pro tem*, had no authority to sign the same under the constitution and laws of this State, or to submit the same under the constitution and laws of this State, or to submit the same to the grand jury.

5th. Because the person who signed the said indictment, as District Attorney *pro tem*, had been appointed by the Court to act as such in this case; and although said appointment was made by the Court, after it had been shown that the District Attorney now in office and lately appointed by the Governor of the State as District Attorney for the Fourteenth Judicial District of the State of Louisiana, in the place of *Alex're R. Splane*, deceased, could not act as such in this cause, because he had been long previous to his appointment, consulted, retained and employed by the defendant as one of his counsel, (all which facts are hereby admitted,) still the defendant contends that this honorable Court has not, under the constitution and laws of the State of Louisiana, any authority to make any such appointment, either *pro tem* or otherwise.

6th. Because there cannot be but one District Attorney for each Judicial District of this State, under the constitution and laws of said State, to be appointed by the Governor, with the advice and consent of the Senate. Wherefore, the defendant prays that this, his motion in arrest of judgment, be allowed to prevail; that the indictment found in this case be quashed and rejected, and that he be discharged from the same in due course of law. And he prays for all such other and further relief as equity and justice may demand.

*Voorhies*, J. This is a motion in arrest of judgment, based on various grounds which are specified by the defendant.

The first error apparent on the face of the record, of which he complains, is, that the bill of indictment found by the grand jury is signed by *Fred. Gates*, as District Attorney, *pro tem*, for the Fourteenth Judicial District of the State of Louisiana, which is an office unknown to the constitution and laws of the State.

The next ground of objection is a consequence of this: that the person who signed the bill of indictment had no authority to do so, or to submit the same to the grand jury. In order to test the validity of these objections, it is necessary to ascertain in the first place whether the Court was invested with legal authority, under the circumstances of this case, to make the appointment of an attorney to prosecute on behalf of the State *pro tempore;* and if so, whether the indictment thus signed and submitted to the grand jury vitiated the proceedings.

The appointment was made under the Act of 1817, which provides, that "whenever, in any of the Courts of this State, the attorney general, or the prosecuting attorney of the district, shall not attend, the judge shall have power to appoint an attorney to prosecute on behalf of the State, *pro tempore.*" This law must be considered as still in force, unless repugnant to the constitution, which provides that "all laws in force at the time of the adoption of the constitution, and not inconsistent therewith, shall continue as if the same had not been adopted."

In relation to the appointment of District Attorneys, the constitution of 1812, contained substantially the same provision as the new constitution; the only difference between the two is, that the latter has limited the duration of the office to two years. Con. 1812, art. 4, sec. 7. Constitution, articles 74, 90. Under both constitutions the number of District Attorneys was fixed by the Legislature and the appointments made by the Governor. Acts of 1813, p. 299 and Acts of 1846, p. 61. The Act of 1846 also makes it the duty of the District Attorneys to attend the sessions of the Courts in each of the parishes in the Judicial District and to represent the State in all civil and criminal cases." The Act of 1813 also required them to discharge their duties in person, unless prevented by sickness or physical impossibility." The Legislature doubtless foreseeing the inconvenience or injury which might result to the public interest in consequence of such absence, enacted the law of 1817. Since the adoption of the new constitution no such provision has been enacted by the Legislature, consequently the Act of 1817 must be considered as still in force.

And here it may be premised, in answer to the objection urged as to the power of the Court to make appointments to office, that the mere designation . or appointment of an attorney to prosecute on behalf of the State *pro tempore*, in certain specified cases, cannot be fairly construed as an appointment to a public office.

It is an appointment not to an office but for the performance of a specific duty, which is incumbent on the District Attorney, who is prevented or ex-

cused from performing the same. The question then arises, had the Court the power, under the Act of 1817, to appoint an attorney to prosecute in this case? In the practice in criminal cases in this district after the enactment of that law, the power was never doubted. I am, therefore, of opinion that the law of 1817 embraces this case.

It is, therefore ordered, adjudged and decreed, that the motion in arrest of judgment be overruled.

*Edward Simon*, for appellant:

The defendant was convicted of manslaughter and sentenced to two years imprisonment at hard labor in the Penitentiary.

The District Attorney of the Fourteenth District, having been employed by the defendant, previous to his appointment as District Attorney, considered himself as incapacitated from prosecuting this case; whereupon *F. L. Gates* was specially appointed by the Court to fulfil the duties of District Attorney in this prosecution. The bill of indictment is signed: "*Fr'c Gates*, Dist. Att'y pro tem. for the Fourteenth Judicial District of the State of Louisiana."

On the trial of this cause, the counsel, representing the State, attempted to introduce in evidence on behalf of the prosecution, a certain document purporting to be an affidavit of the deceased, taken before a magistrate, commencing by the words: "Before me, *Edmond Mongé*, justice of the peace in and for the parish of St. Martin, the information of *Vital Brousson*, of the parish aforesaid, who on his oath complains, &c." Then giving a statement of the facts as related by the affiant to the magistrate, and ending by the words: "All this against the peace and dignity of the State aforesaid and contrary to the form of the statute in such case made and provided. Wherefore the said complainant prays that the said *Alexander Viaux* may be apprehended and held to answer this complaint, and further dealt with according to law." This document was rejected by the Court *à quo*, on the objections made to its admissibility by defendant's counsel.

But after it had been rejected, the prosecuting counsel produced a witness to prove the contents of the document, the declaration having been made in his presence, and to prove that the same, having been made when the deceased was in such a state as to be aware that he was going to die, was said deceased's dying declaration. The testimony was objected to on divers grounds stated in the bill of exceptions, but the judge *à quo*, after hearing the witness as stated at the close of said bill of exceptions, overruled the defendant's objections, and permitted the testimony to go to the jury.

After the verdict, a motion for a new trial was made by defendant's counsel, upon divers grounds, which motion was overruled by the Court.

Before the sentence was pronounced, a motion in arrest of judgment was made on behalf of the defendant on several grounds, which motion was also overruled.

This case then will present three distinct points, to wit:

1st. That resulting from the bill of exceptions taken to the opinion of the Court *à quo*, permitting the contents of deceased's affidavit, to be proven by a witness, and to go to the jury, after the document itself had been rejected.

2d. The questions of law growing out of the motion for a new trial, that is to say, out of the two first grounds.

And 3d. The questions presented by the motion in arrest of judgment.

I. The judge *à quo* allowed the State to prove by parol the contents of a written affidavit which had been rejected, because the witness proposed to be examined first said: "that he was present when deceased gave his declaration to the magistrate, saw the wounds of deceased, and from them he judged he had very little time to live; deceased said before and after giving his declaration, that he would die; and the appearance of deceased indicated that he was conscious of his approaching dissolution." The evidence was objected to on the grounds: that the declaration from the affidavit already rejected, was not a dying one, and had not been made in contemplation of death; that the deceased did not make his said declaration to the magistrate with a view of making a dying declaration, but on the contrary, as shown by the document rejected, to cause a warrant to issue to arrest the defendant; that dying declarations, in order to serve as evidence, must be shown to have been made in those cases alone where the death of the party was the subject of inquiry, and not when the object of

the declaration is to have the accused arrested, as shown by the affidavit already produced and rejected; and that the original written declaration having been rejected, the State had no right to prove its contents by witnesses, said parol proof being secondary evidence only, left entirely to the memory of man, &c.

It is clear the affidavit of the deceased was taken for the only purpose of receiving his complaint and of arresting the defendant, who, at the request of the deceased, was to be dealt with according to law. It was a complaint made before a magistrate, assisted by his constable, (the latter is the witness whose testimony was admitted,) and under such circumstances, could it be expected that the deceased would have stated any other facts but those upon which his complaint was to be based? The affidavit was not made in contemplation of death, and it is reasonable not only to presume, but to conclude that the deceased, in lodging his complaint, must have been influenced and actuated at the time by animosity and resentment against the accused, whose punishment he was seeking by causing him first to be arrested and held to answer his complaint. *Roscoe*, on the subject of *Dying Declarations*, page 33, says: "Such evidence, (speaking of dying declarations) therefore, is liable to be very incomplete. He (the deceased) may naturally, also, be disposed to give a partial account of the occurrence, although possibly not influenced by animosity or ill-will. But it cannot be concealed, animosity and resentment are not unlikely to be felt in such a situation. The power of anger, once excited, may not have been entirely extinguished, even when all hope of life is lost." Such was undoubtedly the situation of the deceased, and the affidavit taken from him, without any other inquiry but what he pleased to state as the basis of his complaint, and without any cross-examination, shows on its face that he had no other object in view but to apply to the laws of the country for the revengeful punishment of his antagonist.

I am well aware that the dying declarations of a person who expects to die, respecting the circumstances under which he received a mortal injury, are generally admitted in criminal prosecutions, but the death must be the subject of the criminal inquiry. Wharton, Am. Crim. Law, p. 179. Here, was the death of the complainant the subject of the inquiry? Surely not. The subject, or rather the object of the inquiry was the prosecution of the accused and the means of bringing him to his punishment. Wharton, page 181, says: "The declarations are only admissible where the death is the subject of the charge, and the circumstances of the death are the subject of the declaration. Thus, in a case where the prisoner was indicted for administering poison to a woman pregnant, but not quick with a child, with intent to procure abortion; the woman was dead, and for the prosecution, evidence of her dying declaration upon the subject was tendered. The learned judge who tried the case, rejected the evidence, observing that, although the declaration might relate to the causes of the death, still such declarations were admissible in those cases alone where the death of the party was the subject of inquiry." Here again, the circumstances of the death were not the subject of the declaration; the affidavit was merely made to procure the arrest of the defendant; for that purpose, the deceased may have related the causes of his expected death, so far as it was necessary to do in making his complaint, but surely there is nothing in the declaration, or in the manner in which it was made and received, showing that the death of the affiant was the subject of the criminal inquiry.

One of my objections to the admissibility of the evidence is: that the State had no right to prove by parol the contents of a written declaration which had already been rejected by the Court. Roscoe, p. 33, says, on the authority of the cases therein cited: "Where a dying declaration has been reduced• to writing and signed by the deceased, neither a copy of the paper nor parol evidence of the contents can be received." The rule is a safe one in favor of the accused, as it would be too dangerous to receive parol evidence of statements made by one person to another who reduced them to writing, inasmuch as the facts disclosed by the secondary evidence, might be inaccurately stated, or may have produced on the mind of the witness an impression entirely different from that which it should have really received. It is true that, in that case, the affidavit of the deceased had been rejected; but it was not the defendant's fault if the State could not use it; it was very properly rejected by the Court, when offered by the State as a dying declaration; it was not intended originally as

STATE
v.
VIAUX.

such—it was not taken for that purpose, and it must seem strange that the contents thereof were allowed to be proven by parol, after the document itself had been declared to be illegal testimony. See also Wharton, page 182.

But it will be urged that the parol evidence of the contents of the affidavit, having been preceded by the proof that the deceased was aware of his approaching death, this was sufficient to make the evidence legal; and this seems to be the foundation of the opinion of the Judge *a quo*, when he admitted the testimony. This preliminary testimony was also objected to; but what does it prove? The witness was present when the deceased gave his declaration to the magistrate; he saw the wounds of deceased, and judged that he had very little time to live. This, then, was simply the opinion of the witness, formed from his examination of the wounds; but he adds that the deceased said before and after giving his declaration, that he would die, and that the appearance of deceased indicated that he was conscious of his approaching dissolution. In what that appearance consisted, the witness does not say, and it must again be merely the opinion of the witness, from the appearance of the deceased only, and from what he may have said at the time. Is this sufficient to show that he was really conscious of his approaching death? Was he fully aware of his situation? He said he would die, but people who say that very often recover. Wharton, *loco citato*, says: "The dying party, to make the declaration evidence, must, at the time of making it, have an idea of a future state." Now, did the deceased in this case, express any such idea? In Roscoe, page 30, it will be seen that it was held that, "for the purpose of determining whether the declarations ought to be received, the conduct of the deceased should be considered, to see if it was that of a person convinced that 'death was at hand,' and not merely the expressions he used respecting his condition." Here, far from having an idea of a future state, and far from abandoning all ideas of this world, the deceased, though he may have said he would die, was actuated, in making his affidavit, by motives of revenge; his object was the prosecution of the defendant, whom he accused of having shot him; and surely no one can conclude from his conduct, not even from his saying that he would die, that his mind was so penetrated with the idea of a future state that he was conscious of his being in such a situation as to appear soon before his God! A man impressed with this idea would have acted differently.

II. A new trial was moved for on two principal grounds: 1st, Because the defendant was served with a copy of the whole original pannel of the Jury, including therein a list of Jurors who, having served on the *Grand Jury*, by whom the bill of indictment was found, could not serve as *Petit Jurors* on the trial of this cause; and also including therein the names of certain Jurors who were exempted by law and by the Court from serving on the Jury at all during the term. And, 2d, Because the regular pannel of the Jury, having been exhausted, the Court ordered two new lists of Jurors to be drawn successively; and said lists having been returned by the Sheriff successively during the trial, the defendant was ruled into the trial of his cause, without having been served with copies of said new lists as the law directs, and was therefore unable to prepare his challenges; and the two grounds may be taken together.

1st and 2d. The original pannel of the Jury was composed of 48 names, a copy of which was served upon the defendant. Among those 48 names, nineteen had been drawn to constitute the Grand Jury, and two of them, to wit: *Gustave Fournet* and *John G. Harry*, were by law exempted from serving on the Jury. It is also admitted that two lists of *talismen* were successively and immediately drawn in open Court during the trial; that the Sheriff made his returns immediately, and that the Jurors were also immediately called to serve on the trial, without any of the said lists having been served on defendant. It resulted, therefore, that in the list of 48 names served upon defendant, as being the list of the Jury that were to pass on his trial, there were 21 names of Jurors who could not be presented to the prisoner; and I contend that that is not only irregular and illegal, but that it vitiates the proceedings in such a way as to cause the verdict to be annulled. The same consequence must result from the want of service of the new lists.

The law of 1805 (Bull. & Cur., p. 248 No. 35) provides that "the accused shall have a copy of the indictment and a list of the Jury which are to pass on his trial, delivered unto him at least two days before he shall be tried." This provision of the law is general in its terms, and the list must contain the names of the

Jurors by whom he is to be tried. This is a right which belongs to the accused, which he cannot be deprived of, and the right is a very important one, in as much as it gives him a fair opportunity of consulting or reflecting upon the Jurors who are to decide upon his fate, and of ascertaining the objections he may have to base his challenges upon. From the list served upon the prisoner in this case, how could he know that nearly one-half of the names could not pass on his trial? How could he ascertain the names of those who were not to pass on his trial? And how could he object to the list when he had every reason to believe that among the 48 names, the Jury that was to try him was to be selected? He had prepared his challenges accordingly; but the *names of the Grand Jurors*, of course, *were not called*, and the accused must necessarily be thrown into great confusion and even disappointment, when he sees that Jurors, by whom he may have wished to be tried, are not called to the book, and that they are to be replaced by others called *instanter*, and taken among the bystanders. This branch of the question the Judge *a quo* has not touched in his written opinion; it did not strike him that the prisoner, relying upon the correctness of the list served upon him, had no objection to make, could not be prepared to make any, as he could not know beforehand that one-half of the names given to him would not be called and presented to him. The case of the *State* v. *Howell*, 3 Ann., 50, is directly applicable to the question; the court says: "The object of the law in directing a list of the Jurors to be furnished to the accused is, to enable him to inquire into the characters of the judges by whom he is to be tried, and to prepare his challenges. The short time allowed him for making this preparation is provided with reference to the limited number of the Jury." And further: "A list containing other names than those of the Jurors who are really to be presented on the trial, necessarily tends to embarrass the accused in his searches for information, and to confuse him in preparing his challenges, and thus defeats the ends of the law; such a list is not a compliance with either the letter or the spirit of the Statute, although it may at the same time contain the names of all the Jurors who are to pass on the prisoner's trial." This question, it seems to me, is very clear; but the lower Judge, in recognizing that such was the right of the prisoner, and that he was entitled to be served with a correct list of the Jury that was *to pass upon his trial*, overruled his motion for a new trial, because he thought the right had been waived by not objecting, and by having, as he says, accepted the Jurors who were presented.

The decision of the Judge *a quo* on this last question, carries too far the doctrine of waiver: it is based upon the case of the *State* v. *Hernandez*, 4 Ann., 379, in which this Court decided that when a copy of the indictment has not been served on the accused, his being brought to the bar, his declaring himself ready for trial, and his accepting the Jurors who are to pass upon his trial, will be considered as a waiver of the right. But here there is, and there cannot be any such waiver; the appellant does not complain that he was not served with a copy of the indictment, but says that the list of Jurors served upon him, was incorrect; that one-half of those Jurors could not pass upon his trial; that he could not know the fact of incorrectness when he was brought to the bar; that he thought the list was correct and had prepared his challenges accordingly; that when the Jury was formed he was induced to believe that the persons whose names were in the list without their being called, were absent; that he only ascertained the fact and the cause of their not being called, after it was too late; that he was deprived of his rights without knowing at the time of the trial that the list was incorrect; that he could not then make the objection; that the new lists of Jurors were made during the trial, without his having been served with copies thereof; and the Jurors were called to serve *instanter ;* and that he cannot be considered as having waived a right which he had at the time no reason to believe had not been extended to him, as he was not then aware that nearly one-half of the Jurors named in the list were incompetent to pass on his trial, nor could he know the fact when the names of the Jurors who were to try his case, were called. On comparing the list of *Grand Jurors* with the names of the *Petit Jurors*, who tried this cause, the Court will see that none of the Grand Jurors were sworn to try this case; and why? Because they were not called to the book, being then yet on the Grand Jury; they were not called, for the officers of the Court knew that they could not serve on the Petit Jury; and yet, *their names were on the list served upon the accused, as*

*Jurors who were to pass upon his trial.* In the case of *Howell*, 3 Ann., 50, it was held that a prisoner does not waive his right, under Sec. 35 of it: 4 May, 1805, to have delivered to him a list of Jurors two days before his trial, by pleading without claiming it. The case of *Howell* is in all respects applicable to the present one, and not the case of *Hernandez*, where the question tried and decided was with regard only to the want of service of a copy of the indictment. Here, again, the list of Jurors was served, but it was incorrect, and the incorrectness was such as the accused could not discover at the time of the trial. The absolute want of service of the other lists, is also a fatal defect in the proceedings of this case; the accused was deprived of this important right, and his pleading and going to trial without claiming it, is not a waiver of it.

III. On the motion in arrest of judgment: This motion is based on the same grounds at those already disposed of; and upon four other grounds relating to the appointment by the Court of a counsel to represent the State in lieu of the District Attorney, and to the manner in which· said counsel signed the bill of indictment, to wit: *as District Attorney pro tem. for the fourteenth Judicial District of the State of Louisiana.*

The questions arising from the appointment of a counsel to represent the State, have been fully argued by my associate counsel in his brief, and I shall not add anything in that respect to his argument. But I contend that the counsel who was acting in this case, by special appointment from the Court, had no right or authority to sign the bill of indictment as District Attorney *pro tem.* for the fourteenth Judicial District of the State of Louisiana, and that his signature as such is a fatal defect, which, of itself, is sufficient to quash the indictment. It is a well-known rule in criminal law, that the indictment must be signed by the prosecuting attorney, and that he must endorse the capacity in which he signed the bill which he presents to the Grand Jury. Here, the prosecuting Attorney calls himself, or rather styles himself, as occupying an office unknown to the Constitution and laws of the State; there is no such office as District Attorney *pro tem.* for any of the Judicial Districts of the State of Louisiana; and although he was acting as District Attorney under the special appointment of the Court, his signature at the foot of the bill in any other capacity, cannot have any more effect than if the bill had been signed by any stranger assuming the quality of District Attorney *pro tem.* This objection, if available, will have the effect of quashing the indictment, and thus will put an end to the case.

Before closing, I shall call the attention of the Court to the rule established by recent decisions, to wit: that when a prisoner has been indicted for *murder*, and the Jury found him guilty of *manslaughter*, upon a new trial granted, he cannot be tried again for the crime of murder. 5 Ann., 398 and 489. So, if a new trial is granted in this case, the appellant shall only be tried for manslaughter.

*Hardy & Gates*, for the State.

When a document purporting to be a dying declaration, has been rejected, as being an affidavit, parol testimony to establish what were the dying declarations of the deceased, is not a violation of the rule of evidence prohibiting parol testimony to establish the contents of a written document.

"The dying declaration of a person who *expects to die*, respecting the circumstances under which he received a· mortal injury, are *constantly* admitted in criminal prosecutions, when the death is the subject of inquiry." (Wharton, p. 179. 2 Starkie's Evid., p. 261.)

"It is *essential* to the admissibility of these declarations, and is a preliminary fact, to be proved by the party offering them in evidence, that they were *made under a sense of impending death.*" (Greenleaf's Evid., vol. 1st., p. 158. 2 Starkie's Evid., pp. 261 and 262.)

It is contended, that there was no error on the part of the Judge below, in admitting the testimony of *G. Bienvenu* to prove what the dying declarations of the deceased were. That the testimony established: That there *was* that sense of "impending death" necessary to make the declarations of the deceased admissible.

It is contended that the "motion for new trial" was not improperly overruled by the Court below. That the objections of the defendant came too late after verdict, and are not good grounds for a motion for new trial. (Vide Acts of 1846, p. 65. *State v. Hernandez*, 4 La. R. 379.)

It is contended, that the "motion in arrest of judgment" was not improperly overruled. That under the Act of 1817 the Court had the power to appoint a

District Attorney *pro tempore.* That when the regularly appointed District Attorney recused himself, he was, as to the case at bar,' by law presumed absent. That the Act of 1817, being in force under the Constitution of 1812, and the Constitution of 1845 not clashing with that of 1812, containing no clause relative to the appointment of District Attorney contrary to or repealing that of 1812—the law of 1817 was in force under the Constitution of 1845. That the District Attorney pro tempore was the proper officer to draw up, sign and present the bill of indictment to the Grand Jury.

DUNBAR, J. The defendant was indicted for the murder of *Vestal Broussen,* found guilty by the Jury of manslaughter, and has been condemned by the District Judge to be imprisoned in the Penitentiary or State Prison at hard labor for the term of two years. On the trial, the District Attorney offered in evidence as a dying declaration, an affidavit of the deceased, in writing, made and signed by him before a magistrate, for the arrest of the defendant. The counsel for the defence objected to the affidavit as inadmissible, and it was rejected by the Court. Afterwards the State offered the testimony of *G. Bienvenu,* who proved "that he was present when deceased gave his declaration to the magistrate, *Mongé;* saw the wounds of deceased, and from them he judged he had very little time to live; deceased said before and after giving his declarations that he would die, 'qu'il allait mourir.' The appearance of deceased indicated that he was conscious of his approaching dissolution." Upon this foundation, the District Judge permitted the declarations of the deceased to be given in evidence. To which opinion of the Court admitting the said testimony the defendant took his bill of exceptions. We think the Judge did not err. After the defendant had himself objected to those declarations reduced to writing, in the form of an affidavit, for his arrest, he could not with any propriety turn round and object to evidence being given by parol, as related above, of what the deceased did declare before the magistrate. Depositions of the deceased taken in writing by a magistrate, in the Hospital where he lay, but not in the presence of the prisoner, were offered in evidence, it being objected that those depositions could not be read, as not having been taken pursuant to the Statute, 10 Car. c. 1. (Irish.) *Downs,* J., ordered the magistrate to be sworn, and he having deposed that the deceased at the time of making those depositions, was impressed with the fear of immediate death, his parol testimony of the facts declared by the deceased was admitted. Roscoe's Criminal Evidence, p. 33. McNally, 385. The magistrate, perhaps, should have been examined in preference to the witness who was a mere looker-on at the taking of the affidavit of the deceased, but this objection was not made in the Court below.

The defendant then moved for a new trial, and an arrest of judgment, upon the following grounds: First, that the Court had no right to appoint under the circumstances of this case a District Attorney pro tem. to prosecute for the State. The reasons given in the opinion of the District Judge on this point are to our minds perfectly satisfactory, and we think the appointment was well made. Second, that there had been irregularities in summoning the Jury, in the service on him of the list of Jurors, &c., and that the verdict of the Jury was contrary to law and evidence. These alleged defects are all specially set forth in the pleadings aforesaid, and passed upon in the judgment of the District Court. We refer to them merely without copying them in this decision, because they have been all considered and well answered in the opinion of the District Judge, whose reasons for overruling the said motions we adopt as our own.

The judgment of the District Court is therefore affirmed with costs.